UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: OXFORD EXPOSITIONS, LLC                              CASE NO. 10-16218-DWH

OXFORD EXPOSITIONS, LLC,
EDWIN E. MEEK, and
JENNIFER ROBINSON                                           PLAINTIFFS/COUNTER-DEFENDANTS

VERSUS                                                      ADV. PROC. NO. 11-01095-DWH

QUESTEX MEDIA GROUP, LLC                                    DEFENDANT/COUNTER-PLAINTIFF

OPINION

On consideration before the court are the following, to-wit:

1. Motion by Questex Media Group, LLC, ("Questex"), to determine whether a motion filed by the debtor, Oxford Expositions, LLC, ("Oxford Expo"), to conduct certain trade show activities is a non-core proceeding; a response to said motion having been filed by Oxford Expo.

2. Request by Questex to determine the statutory and constitutional limits of bankruptcy court jurisdiction regarding the above captioned adversary proceeding; a response to said request having been filed by Oxford Expo with a joinder in said response by Edwin E. Meek ("Meek") and Jennifer Robinson ("Robinson").

And the court, having heard argument and considered the memoranda submitted by the parties, hereby finds as follows:

I.

The court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157, in addition to the orders of reference of bankruptcy cases and proceedings to the United States Bankruptcy Judge, nunc pro tunc, dated July 27, 1984 and

August 13, 1984, executed by the United States District Court for the Northern District of Mississippi. Whether the motion to conduct certain trade show activities and the related adversary proceeding, captioned hereinabove, both of which are practically identical, are core or non-core proceedings will be determined through this opinion.

II.

FACTUAL SUMMARY

On April 15, 2007, pursuant to a Stock Purchase Agreement, ("SPA"), Questex Media Group, Inc., ("Old Questex"), purchased all of the shares of stock of Oxford Publishing, Inc., ("Oxford Publishing"), and Oxford Communication, Inc., ("Oxford Communication"), from Meek and others for the total consideration of $40,000,000.00. Oxford Publishing and Oxford Communication were engaged in the business of publishing magazines related to the hospitality industry, as well as, the promotion and management of trade shows related to this same industry throughout the United States. As a part of the SPA, Meek expressly agreed not to engage directly or indirectly in businesses like those conducted by Oxford Publishing or Oxford Communication, as well as, businesses proposed to be conducted by Oxford Publishing or Oxford Communication for a period of five years from the closing date of the SPA. The non-competition and non-solicitation provision is found in paragraph 6.6 of the SPA, and the definition of "Business" is found in the definition section on page 2. To understand the scope of the non-compete, both of these provisions must be read together.

The non-compete provision in the SPA reads as follows:

> 6.6 <u>Noncompetition and Nonsolicitation</u>. For a period of five years from and after the Closing Date, other than as an employee or agent of an Acquired Company, none of the Sellers will, and will cause each of their Affiliates not to, engage directly

or indirectly in all or any portion of the Business as conducted as of the Closing Date; provided, however, that no owner of less than 5% of the outstanding stock of any publicly-traded corporation will be deemed to be so engaged solely by reason thereof in the Businesses. For a period of five years from and after the Closing Date, the Sellers will not, and will cause each of their Affiliates not to, recruit, offer employment, employ, engage as a consultant, lure or entice away, or in any other manner persuade or attempt to persuade, any Person who is an employee of any of the Acquired Companies to leave the employ of the Acquired Companies. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 6.12 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

Succinctly stated, the aforesaid provision prohibits each of the sellers, which includes Meek, his wife and daughter, as well as, two trusts established for the benefit of his grandchildren, from engaging directly or indirectly "in all or any portion of the Business as conducted as of the closing date;..." "Business" is defined in the SPA as "the business conducted by the Acquired Companies and proposed to be conducted by the Acquired Companies."

The business activities of Oxford Publishing were described in the Employment Agreement entered into by Oxford Publishing and Jennifer Robinson. That document indicates that Oxford Publishing was engaged in the business of publishing magazines related to the hospitality, nightclub, bar, and food and beverage industries throughout the United States, as well as, the promotion, conduct, and management of trade shows related to the same.

On October 9, 2009, QMG Acquisition, LLC, ("QMG Acquisition"), entered into an Asset Purchase Agreement, ("APA"), with Old Questex, Oxford Publishing, Oxford Communication, and others, through which QMG Acquisition proposed to purchase predominantly all of the assets of the

3

selling entities. On that same date, Old Questex, Oxford Publishing, Oxford Communication, and the other selling entities filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware. Thereafter, on November 24, 2009, the bankruptcy court entered an order approving the APA.

At an earlier hearing, Oxford Expo questioned whether the APA actually included the SPA by which Old Questex had acquired the stock of Oxford Publishing and Oxford Communication. Questex responded by introducing into evidence Schedule 1.1(b), which it asserts was attached to the APA, thus indicating that the SPA was indeed included in the asset sale. The attorneys representing Oxford Expo and Meek indicated that Schedule 1.1(b) did not appear electronically in the Delaware bankruptcy court file. Regardless, if this schedule was attached to the APA, then the SPA was likely included in the transaction. On December 16, 2009, a Bill of Sale Assignment and Assumption Agreement was executed which effectively consummated the APA by conveying the assets from Old Questex, Oxford Publishing, Oxford Communication, and the other selling entities to QMG Acquisition.

On December 17, 2009, QMG Acquisition changed its corporate name through the Office of the Delaware Secretary of State to Questex Media Group, LLC, the party now involved in these proceedings. In January, 2010, Old Questex, Oxford Publication, and Oxford Communication changed their corporate names respectively to QMG Winddown, Inc., OPI Winddown, Inc., and OCI Winddown, Inc.

An event, which caused a significant amount of confusion regarding the efficacy of the APA, particularly whether it included the SPA, occurred on June 21, 2010, approximately seven months after the entry of the aforementioned order by the Delaware bankruptcy court approving the APA.

This involved the filing of a motion in the bankruptcy court by QMG Winddown, OPI Winddown, OCI Winddown, and the other debtor entities requesting the entry of an order authorizing the rejection of thirteen executory contracts. This motion specifically included the SPA even though it had already been purportedly transferred out of the bankruptcy estates pursuant to the APA. An order rejecting these executory contracts, specifically listing the SPA, was entered by the Delaware bankruptcy court on July 25, 2010. The attorneys representing Questex contend that this was simply a mistake since the SPA had already been conveyed and thus removed from the bankruptcy estates.

Meek testified at the hearing that when he saw the order rejecting the SPA, he thought, with good reason, that the non-compete provision in the SPA was no longer effective. Of course, if the SPA had previously been properly transferred from the bankruptcy estates, there would have been no SPA executory contract to reject.

On August 16, 2010, after their corporate names had been changed, the bankruptcy cases of Old Questex, Oxford Publishing, and Oxford Communication were dismissed.

### III.

### FACTUAL BACKGROUND REGARDING JENNIFER ROBINSON'S OBLIGATIONS UNDER THE NON-COMPETE PROVISIONS IN HER EMPLOYMENT AGREEMENT, AS WELL AS, HER CONSULTING AGREEMENT

Jennifer Robinson, who had been employed by Oxford Publishing for a number of years, entered into an Employment Agreement with Oxford Publishing on January 1, 2006. Coincidentally, in this Employment Agreement there is the description, mentioned above, of the business activities conducted by Oxford Publishing.

The provision in the agreement addressing Robinson's non-compete obligation was paragraph 12(e)(1), which provides as follows:

> (e) <u>Non-Competition: Non-solicitation.</u>
>
> (1) During the Employment Term and for three (3) years thereafter (the "Non-Competition Period"), Executive will not, directly, or indirectly, own, manage, operate, join control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, partner, principal, agent, representative, consultant or otherwise with, or use or permit Executive's name to be used in connection with, any business or enterprise within the Territory that competes with the Corporation or its affiliates, including, without limitation, any engagement in any publishing or trade show business directed at the hospitality, nightclub, bar and food and beverage industries or any other such business that Corporation may conduct or start publishing or trade show activities while Executive is employed with the Corporation (the "Business"). The term "Territory" means all states in which the Corporation currently, or at the time of termination of employment, operates or has discussed or considered expanding. Executive acknowledges and agrees that the Territory identified in this §12(e) is the geographic area in or as to which she is expected to have supervisory responsibilities and/or otherwise to perform services for the Corporation, by being actively engaged as a member of the Corporation's management team as Chief Operating Officer during her employment with the Corporation. The provisions of this section shall survive the termination or expiration of this Employment Agreement and remain binding upon Executive for the period herein set forth. Further, this covenant, on the part of Executive, shall be construed as a separate agreement, independent of any other provision herein set forth; and the existence of any claim or cause of action by Executive against Corporation, whether predicated on this Employment Agreement or any other provision hereof, or otherwise, shall not constitute a defense to the specific enforcement by Corporation of this covenant. Executive acknowledges and agrees that the restrictive covenant set forth in this Employment Agreement is reasonable, that Executive has been adequately compensated under this Employment Agreement for the future financial hardship that compliance with this covenant might otherwise have created, and that Executive has available other suitable employment opportunities (outside the Business and otherwise) which eliminate the need for or desirability of employment within the Business.

Following the closing of the SPA, Robinson continued her employment with Oxford Publishing until she voluntarily terminated the Employment Agreement on September 28, 2008. On

October 27, 2008, she entered into a Consulting Agreement with Oxford Publishing which apparently modified the scope of her employment. A revised non-compete provision was inserted in the Consulting Agreement at paragraph 1.2, which provided as follows:

> 1.2 The parties further acknowledge and agree that, the Consultant's resignation of employment and resulting termination of the Employment Agreement notwithstanding, the provisions of Section 12 of said Employment Agreement shall survive, and the covenants of the Consultant therein are hereby re-made by, and will apply to the Consultant during the Consulting Period and thereafter, as therein provided, *mutatis mutandis*; provided, (a) the "Non-Competition Period" defined in Section 12(e)(1) thereof shall expire on the later to occur of (I) October 31, 2011, or (ii) the second anniversary of the termination of this Agreement, however occasioned; and (b) the "Territory" defined in Section 12(e)(1) thereof shall mean that geographic area where the Company conducts business as of the date of termination; and (c) the competitive activities which the Consultant agrees to refrain from engaging as provided in Section 12(e)(1) thereof shall also include any other business in which the Consultant provides services to the Company under this Agreement. The Consultant reaffirms the reasonableness and necessity of such restrictions continuing following her resignation and during the Consulting Period and thereafter, as provided.

Questex ceased paying Robinson's monthly retainer of $14,166.66 in January, 2009, just two months following the execution of the Consulting Agreement. Contrary to paragraph 4 of the Consulting Agreement, Robinson was not given a thirty day written notice of termination. Robinson made inquiry about the non-payment and was sent a letter by Attorney David Amidon with the law firm of Burns and Levinson, LLP, advising that she had violated her contractual obligations with Oxford Publishing by soliciting Oxford Publishing customers and/or interfering with Oxford Publishing's business relations. Robinson denied the accusations, but took no further action to enforce her rights under the agreement.

Questex pointed out that the non-compete provision in the Employment Agreement was "remade" and incorporated into the Consulting Agreement. The initial agreement included a three

year non-compete period following Robinson's termination of employment. However, the Consulting Agreement redefined the <u>non-compete period</u> as follows:

> (a) the "Non-Competition Period" defined in Section 12(e)(1) thereof shall expire on the later to occur of (I) October 31, 2011, or (ii) the second anniversary of the termination of this Agreement, however occasioned;

Consequently, insofar as the <u>non-compete period</u> is concerned, the provision in the Consulting Agreement specifically supercedes the provision in the Employment Agreement.

IV.

## OTHER FACTUAL EVENTS AFFECTING THE DETERMINATION OF WHETHER THESE PROCEEDINGS ARE CORE OR NON-CORE

After Meek learned that the SPA had been rejected by the order of the Delaware Bankruptcy Court, as set forth hereinabove, he believed that he had been relieved of his non-compete obligation. Therefore, with the assistance of Robinson, he incorporated Oxford Expo and announced that it would be putting on a "Wine Summit" and a "Hospitality Summit." Shortly thereafter, Questex sent cease and desist letters to Meek and Robinson on June 11, 2010, advising them to terminate any business activities that would violate the non-compete provisions. This prompted Oxford Expo, Meek, and Robinson to file a complaint for injunctive and declaratory relief in the Chancery Court of Lafayette County, Mississippi. Questex removed this proceeding to the United States District Court for the Northern District of Mississippi and filed an answer and counterclaim against Oxford Expo, Meek, and Robinson.

Following the Chapter 11 bankruptcy filing by Oxford Expo, coupled with the filing of the above captioned adversary proceeding which, for all practical purposes, mirrored the cause of action pending in the United States District Court, the district court transferred its proceeding to the

bankruptcy court. This court acknowledged in a previous decision that if certain parts or aspects of the transferred cause of action required adjudication in the district court, such as a Constitutional right to a jury trial in the absence of unanimous consent for this court to conduct said trial, the cause of action would be referred to the district court for disposition.

Questex has filed a proof of claim in the Oxford Expo bankruptcy case which is directly related to its counterclaim against Oxford Expo. Additionally, Questex's proof of claim also seeks administrative expenses from the bankruptcy estate for any perceived accruing damages. The objection filed by Oxford Expo to the Questex proof of claim raises the same issues that are asserted in the adversary proceeding. *See* Fed. R. Bankr. P. 3007(b).

V.

DISCUSSION

Section 157(b)(2) of Title 28 of the United States Code[1] (28 U.S.C. §157(b)(2)) provides the following non-inclusive list of core proceedings:

> (b)(2) Core proceedings include, but are not limited to–
>
> (A) matters concerning the administration of the estate;
> (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12 or 13 or title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
> (C) counterclaims by the estate against persons filing claims against the estate;
> (D) orders in respect to obtaining credit;
> (E) orders to turn over property of the estate;
> (F) proceedings to determine, avoid, or recover preferences;
> (G) motions to terminate, annul, or modify the automatic stay;
> (H) proceedings to determine, avoid, or recover fraudulent conveyances;

---

[1] Hereinafter, all cited Code sections will be considered as sections of Title 28 of the United States Code unless specifically denoted otherwise.

> (I) determinations as to the dischargeability of particular debts;
> (J) objections to discharges;
> (K) determinations of the validity, extent, or priority of liens;
> (L) confirmations of plans;
> (M) orders approving the use or lease of property, including the use of cash collateral;
> (N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and
> (P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

Subsections (A), (B), and (O) are specifically applicable to this proceeding. Section 157(b)(3) provides that "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding . . . or is a proceeding that is otherwise related to a case under title 11," i.e., a non-core proceeding. The section further provides that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." § 157(b)(3) (emphasis added).

A recent case decided by the United States Supreme Court, *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), has caused a great deal of consternation among bankruptcy professionals, particularly concerning the extent of its impact on bankruptcy court jurisdiction. The underpinnings of the decision can be briefly summarized. Vickie Lynn Marshall ("Vickie"), also known as Anna Nicole Smith, married J. Howard Marshall, II ("Howard"), approximately a year before his death. 131 S.Ct. at 2601. Shortly before Howard died, Vickie filed a cause of action against his son, E. Pierce Marshall ("Pierce"), in a Texas probate court, asserting that Pierce had tortiously interfered with the establishment of a trust that Howard intended to provide for her. *Id.* After Howard's death, Vickie filed for bankruptcy relief in the Central District of California. *Id.*

10

Pierce filed a proof of claim in her bankruptcy case, asserting that he was entitled to recover damages from Vickie's bankruptcy estate because she had defamed him by inducing her lawyers to tell the press that he had engaged in fraud in controlling his father's assets. *Id.* Pierce also asserted that his claim against Vickie was a nondischargeable debt. *Id.* Vickie responded by filing a counterclaim against Pierce for tortious interference, similar to the complaint that she had asserted earlier in the Texas probate court. *Id.* The bankruptcy court initially denied Pierce's claims for defamation and nondischargeability. *Id.* Almost a year later, the bankruptcy court considered Vickie's tortious interference counterclaim and awarded her compensatory damages exceeding $400 million, as well as, punitive damages in the sum of $25 million. *Id.* Overruling Pierce's objection that the bankruptcy court lacked jurisdiction to consider Vickie's counterclaim, the bankruptcy court concluded that Vickie's counterclaim was a core proceeding pursuant to § 157(b)(2)(C) and entered a final judgment for the aforementioned damages. *Id.* At 2602.

The district court reversed, relying primarily on an earlier decision of the United States Supreme Court, *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and concluding that it was unconstitutional to hold that any and all counterclaims were core proceedings. 131 S.Ct. at 2602. The district court then treated the bankruptcy court's final judgment as if it were proposed findings of fact and conclusions of law and entered a judgment in Vickie's favor for compensatory and punitive damages, each in the amount of $44,292,767.33. *Id.* However, before the district court entered its judgment, the Texas probate court conducted a jury trial on the merits of the parties' dispute and entered a judgment in Pierce's favor. *Id.* The district court declined to give the Texas judgment preclusive effect. *Id.*

11

The Ninth Circuit Court of Appeals reversed the district court for different reasons and the matter journeyed on its first trip to the United States Supreme Court. *Id.* The Supreme Court reversed the decision of the Ninth Circuit and remanded. *Id.* On its second opportunity, the Ninth Circuit concluded that a counterclaim under § 157(b)(2)(C) was a core proceeding only if the counterclaim was so closely related to the creditor's proof of claim that the resolution of the counterclaim was necessary to resolve the allowance or disallowance of the proof of claim. *Id.* The Ninth Circuit held that Vickie's counterclaim did not meet that test. *Id.* The court then concluded that, since the Texas state court judgment was the earliest final judgment entered in the matter, that the district court should have given preclusive effect to the Texas court's determination. *Id.* at 2602-03. That decision was again appealed to the United States Supreme Court which granted certiorari. *Id.* at 2603. Succinctly stated, the Supreme Court concluded in a five to four decision that while a counterclaim, filed by the bankruptcy estate against a creditor who has filed a claim against the estate, is statutorily defined as a core proceeding, under the circumstances existing in this case, the entry of the final judgment by the bankruptcy court was constitutionally impermissible. *See id.* at 2620.

There are some students of bankruptcy lore who are concerned that *Stern* impacts the subject matter jurisdiction of the bankruptcy courts. This court does not believe that is the case at all. After expressly agreeing that the bankruptcy court could litigate his defamation claim, Pierce, on appeal raised § 157(b)(5) of the Bankruptcy Code for the first time, asserting that his claim was a personal injury tort claim, and, consequently, that it should have been litigated in the district court. *See id.* at 2607-08. Justice Roberts, writing for the majority, specifically found that § 157(b)(5) was not jurisdictional, to-wit:

12

> We need not determine what constitutes a "personal injury tort" in this case because we agree with Vickie that § 157(b)(5) is not jurisdictional, and that Pierce consented to the Bankruptcy Court's resolution of his defamation claim. Because "[b]randing a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system," *Henderson v. Shinseki*, 562 U.S. ___, ___ ___ ___, 131 S.Ct. 1197, 1201-03, 179 L.Ed.2d 159 (2011), we are not inclined to interpret statutes as creating a jurisdictional bar when they are not framed as such. See generally *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) ("when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character").
>
> Section 157(b)(5) does not have the hallmarks of a jurisdictional decree. To begin, the statutory text does not refer to either district court or bankruptcy court "jurisdiction," instead addressing only where personal injury tort claims "shall be tried."
>
> The statutory context also belies Pierce's jurisdictional claim. <u>Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. See §§ 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction. See § 157(c)(2) (parties may consent to entry of final judgment by bankruptcy judge in non-core case)</u>. By the same token, § 157(b)(5) simply specifies where a particular category of cases should be tried. Pierce does not explain why that statutory limitation may not be similarly waived.

*Id.* at 2606-07 (emphasis added) (footnote omitted).

Not only does the aforementioned language indicate that the bankruptcy court's subject matter jurisdiction is not adversely impacted by the *Stern* decision, it also confirms that a party can consent to the bankruptcy court's entering a final judgment in a non-core matter as contemplated by § 157(c)(2). In the absence of consent, the bankruptcy court has subject matter jurisdiction to consider a non-core proceeding, but must only make proposed findings of fact and conclusions of law which are to be submitted to the district court for the entry of a final order after reviewing de novo those matters to which a party has timely and specifically objected.

In the factual scenario presented by *Stern*, Vickie's counterclaim for tortious interference had clearly lost its flavor as a counterclaim when it was ultimately considered and decided by the

13

bankruptcy court. *See id.* at 2617-18. Since Pierce's defamation claim had already been adjudicated and denied months earlier, Vickie's counterclaim had transitioned into merely a claim based exclusively on state law. *See id.* This claim was obviously not necessary or inextricably related to the determination of Pierce's claim which had already been disallowed. *See id.*

Insofar as consent is concerned, by way of analogy, this court would look to another recent Supreme Court decision, *AT&T Mobility, LLC v. Concepcion,* 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), where the court effectively held that if parties to a contract had contractually agreed to binding arbitration, a final decision could be rendered by an arbitration panel even though the arbitrators might not enjoy the attributes of Article III judges. *See* 131 S.Ct. at 1753. Indeed, many arbitrators are not licensed attorneys, and unlike United States Bankruptcy Judges, they are not appointed to fourteen year terms by an Article III Court of Appeals, nor do they have their compensation statutorily linked to the compensation of Article III district judges. Certainly if non-judges can enter binding decisions with the contractual consent of the parties, then bankruptcy judges ought to be able to enter final judgments in non-core bankruptcy proceedings where the parties have consented to their doing so. As noted hereinabove, that is expressly acknowledged by the Supreme Court's majority in *Stern*.

In this context, the court would point to a section in the *Stern* opinion which discusses *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 836, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), as follows:

> A customer filed such a claim to recover a debit balance in his account, while the broker filed a lawsuit in Federal District Court to recover the same amount as lawfully due from the customer. The broker later submitted its claim to the CFTC, but after that agency ruled against the customer, the customer argued that agency jurisdiction over the broker's counterclaim violated Article III. This Court disagreed,

14

> but only after observing that (1) the claim and the counterclaim concerned a "single dispute"–the same account balance; (2) the CFTC's assertion of authority involved only "a narrow class of common law claims" in a "'particularized area of law'"; (3) the area of law in question was governed by "a specific and limited federal regulatory scheme" as to which the agency had "obvious expertise"; <u>(4) the parties had freely elected to resolve their differences before the CFTC</u>; and (5) CFTC orders were "enforceable only by order of the district court." (quoting *Northern Pipeline*, 458 U.S., at 85, 102 S.Ct. 2858); see 478 U.S., at 843-844; 849-857, 106 S.Ct. 3245. Most significantly, given that the customer's reparations claim before the agency and the broker's counterclaim were competing claims to the same amount, the Court repeatedly emphasized that it was "necessary" to allow the agency to exercise jurisdiction over the broker's claim, or else "the reparations procedure would have been confounded."

*Stern*, 131 S.Ct. at 2613-14 (emphasis added) (citations omitted).

The court then went on to point out the following:

> And in contrast to the objecting party in *Schor, id.*, at 855-856, 106 S.Ct. 3245, Pierce did not truly consent to the resolution of Vickie's claim in the bankruptcy court proceedings.

*Id.* at 2614.

In summary, the holding in *Stern* was limited, and the majority, in the opinion of this court, did not intend to obliterate the subject matter jurisdiction of the bankruptcy courts. The following comments are insightful:

> We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a "narrow" one.

*Id.* at 2620.

The Supreme Court has now instructed that state law counterclaims, which would not necessarily have to be resolved in the process of ruling on a creditor's proof of claim, are no longer core proceedings simply by virtue of being statutorily listed in § 157(b)(2)(C). *See id.* By implication, the converse should also be true: The *Stern* opinion does not abrogate the authority of

15

a bankruptcy court to enter a judgment on a state law counterclaim that by necessity must be resolved in the process of ruling on the creditor's proof of claim. Consequently, where the two are inextricably tied, the counterclaim could conceivably still be a core proceeding. One bankruptcy court has already examined this issue in *In re Salander O'Reilly Galleries*, 2011 WL 2837494 (Bankr. S.D.N.Y. 2011), where the court offered the following comments:

> *Stern* is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case, and the ruling does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations . . . .

*Salander*, at *6.

. . .

> Nowhere in *Marathon, Granfinanciera,* or *Stern* does the Supreme Court rule that the bankruptcy court may not rule with respect to state law when determining a proof of claim in the bankruptcy, <u>or when deciding a matter directly and conclusively related to the bankruptcy</u>. As noted, *Stern* repeatedly emphasizes that it addresses only the constitutionality of the bankruptcy court making a final ruling on a state-law counterclaim that would not be finally resolved in the process of allowing or disallowing a proof of claim.

*Id.* at *7. (emphasis added).

. . .

> The thread that binds these cases is the concept that when the jurisdiction of the bankruptcy court is at issue, the adjudication of a proof of claim - a request for payment from the estate - is of paramount concern.

*Id.*

. . .

> It is clear from the foregoing that the Bankruptcy Court is empowered to apply state law when so doing would finally resolve a claim

*Id.* at *8.

16

In addition, two other recent decisions have reached the identical conclusion: *In re: Olde Prairie Block Owner, LLC*, ___ B.R. ___, 2011 WL 3792406 (Bankr.N.D.Ill.), and *In re: Safely Harbor Resort and Spa a/k/a S. H. S. Resort, LLC*, 2011 WL 3841599 (Bankr.M.D.Fla.).

Consequently, if a state law counterclaim must be determined in the process of ruling on a creditor's proof of claim, pursuant to §§ 501 and 502 of the Bankruptcy Code, and Rule 3007, Federal Rules of Bankruptcy Procedure, then it arises both under the Bankruptcy Code and in the bankruptcy case. If the state law counterclaim does not need to be determined in the process of ruling on a creditor's claim, as in the case of *Stern*, it does not.

As set forth hereinabove, the Questex claims in this case are based on the allegations set forth in the counterclaim filed against Oxford Expo, Meek, and Robinson. Additionally, the proof of claim indicates that Questex seeks post-petition administrative expenses based upon Oxford Expo's alleged continuing breach of the SPA and the non-compete agreements. These claims against Oxford Expo are for pre-petition and post-petition damages in addition to the remedial claim for injunctive relief which would effectively terminate Oxford Expo's ability to operate as a going concern. As such, they are core proceeding claims as defined in § 157(b)(2)(A), (B), and (O). The court will, therefore, enter a final judgment resolving these claims between Questex and Oxford Expo.

The next issue for determination was not addressed at all in the *Stern* opinion. It involves the other parties to the cause of action, Meek and Robinson, who are both plaintiffs and counter-defendants, but who are not debtors in bankruptcy. This is not a novel factual scenario. On many occasions, contested and adversary proceedings involving multiple parties are filed in a bankruptcy case, and, frequently only one of the parties is a debtor in bankruptcy. While the primary thrust of

17

this litigation is a core bankruptcy proceeding, that is, whether the debtor, Oxford Expo, can continue as a viable business, the other parties, Meek and Robinson, on one side, and Questex on the other side, are non-debtor entities. These latter parties would not be in the bankruptcy court at all, but for the Chapter 11 filing of Oxford Expo. Although there is little guidance to resolve this question, the court is of the opinion that while the causes of action between Meek, Robinson, and Questex are inextricably related to the Oxford Expo bankruptcy case, in an abundance of caution, they must be construed as non-core proceedings. Absent the consent of Questex for this court to enter final orders and judgments, pursuant to 28 U.S.C. § 157(c)(1), the court will consider the issues between these parties as non-core proceedings and submit proposed findings of fact and conclusions of law to the district court for the entry of any final order or judgment. While this is not an ideal approach, it does comport with the framework established by Congress when enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984. This approach will also promote judicial economy by not having separate lawsuits proceeding simultaneously in separate forums which could lead to inconsistent judicial results.

A separate order will be entered consistent with this opinion contemporaneously herewith. This the 9th day of September, 2011.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE